**In re Johnnie MARSHALL, Debtor.**

**Bankruptcy No. 94–81332.**

United States Bankruptcy Court,
N.D. Alabama,
Northern Division.

April 17, 1995.

Wesley G. Smith, UAW, Madison, AL, for debtor.

Witty Allen, Decatur, AL, for movant.

## ORDER ON OBJECTION TO CONFIRMATION

### (Filed by AmSouth Bank)

BENJAMIN COHEN, Bankruptcy Judge.

This matter came before the Court for a hearing on the Objection to Confirmation filed by AmSouth Bank. Appearing were the Debtor, Mr. Johnnie Marshall, the attorney for the Debtor, Mr. Wesley G. Smith, and Mr. Witty Allen, the attorney for AmSouth. The objection was submitted on affidavits filed by the parties following the hearing, the record in the case and the arguments of counsel, who advised the Court that no testimony would be offered. Other than the value of one asset, the facts are not disputed.

### I. Findings of Fact

Mr. Marshall is a masonry contractor primarily engaged in the business of pouring and finishing concrete. His wife is also employed, although not by Mr. Marshall. They have three children. The oldest is five. The Marshalls own three vehicles which include a 1991 Pontiac Grand Am, a 1989 Pontiac Bonneville, and a 1984 Ford pickup truck. The Grand Am and the Bonneville are both collateral for a secured loan made by AmSouth to Mr. Marshall. The balance of that loan was $24,598.06 as of the date the objection was filed. The pickup truck is unencumbered.

The cars are generally in good condition. Mrs. Marshall uses one for transportation to and from work and for family related functions and activities. Mr. Marshall uses the other for the less physical aspects of his business, for transportation to and from job sites, and for family related functions and activities.

The pickup truck is in poor condition. The Marshalls purchased it for $400.00 and as of the date of the hearing the truck's odometer registered over 300,000 miles. The truck can be described as a "junker." It is used by Mr. Marshall only in his concrete business for transporting workmen, materials and tools. Consequently, it is almost always filthy and full of junk.

The parties stipulated that the value of the Grand Am is $6,850.00. The value of the Bonneville is in dispute.

### II. Contentions

The Chapter 13 plan filed by Mr. Marshall proposes to pay AmSouth $9,487.00 plus interest at the rate of 9% on its secured claim, which amount ostensibly represents his judgment of the combined value of the Grand Am and the Bonneville. In its capacity as an unsecured creditor, AmSouth objects to confirmation of the plan on the basis that Mr. Marshall should not be allowed to support three automobiles with money that could otherwise be paid into the plan for distribution to unsecured creditors when his and his family's needs would be satisfied for the next five years with one automobile and the pickup truck. In its capacity as a secured creditor, AmSouth objects to the confirmation of the plan on the basis that its collateral is worth more than the amount that Mr. Marshall proposes to pay.[1]

---

1. AmSouth's objection also makes reference to a separate claim secured by certain unimproved land owned by the Debtor and contends that "[t]he real estate given as security for the loan is not necessary for the rehabilitation or reorganization of the debtor." The Debtor's plan provides for the surrender of the property to AmSouth in full satisfaction of the debt. No argument was made by AmSouth at the hearing regarding the land or the treatment in the plan of

### III. Conclusions of Law

### A. AmSouth's Unsecured Objection

Section 1325(b) provides:

(1) If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan—

(A) the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or

(B) the plan provides that all of the debtor's projected disposable income to be received in the three-year period beginning on the date that the first payment is due under the plan will be applied to make payments under the plan.

(2) For purposes of this subsection, 'disposable income' means income which is received by the debtor and which is not reasonably necessary to be expended—

(A) for the maintenance or support of the debtor or a dependent of the debtor; and

(B) if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business.

11 U.S.C. § 1325(b).

AmSouth concludes that Mr. Marshall does not need three vehicles to effectuate his Chapter 13 plan and that by proposing to expend money that might otherwise be distributed to unsecured creditors to pay for an unnecessary automobile, Mr. Marshall has run afoul of 1325(b)(1)(B) which requires him, as a prerequisite to confirmation, to commit to the plan all of his disposable income, that is all income not reasonably necessary for the support of himself or his family, or for the operation of his business.[2]

■■■ All families have basic transportation needs.[3] Where children are involved, when both spouses work and when one spouse is self employed in a business which requires him to "be in more than one place at a time," few families would be able to function with one car and a work orientated pickup truck. Mrs. Marshall needs an automobile to get to work. Mr. Marshall needs an automobile for the less physical aspects of his business and he needs a work vehicle for his workmen and himself to travel from job to job and to haul tools, supplies and materials.

Without any evidence that the Marshalls do not need these three vehicles to conduct their personal and professional affairs, this Court concludes that the income to be expended by Mr. Marshall to retain both the Grand Am and the Bonneville is not part of the Debtor's "disposable income," but, instead, is income reasonably necessary for Mr. Marshall to support himself and his family and to operate his business. This Court finds 1325(b)(1)(B) is satisfied and that the unsecured portion of AmSouth's objection is due to be overruled.

the claim secured by the land. The Court assumes, therefore, that AmSouth has acquiesced in that portion of the Debtor's plan and no longer objects to the proposed treatment of its claim secured by the land. Therefore, any reference to AmSouth's "secured claim" in this opinion and order is intended to address only that claim secured by the Debtor's two automobiles.

**2.** AmSouth's argument at the hearing assumed that the Marshalls will have two *adequate* means of transportation remaining if one of the cars is returned to AmSouth. According to representations of the Debtor's attorney, the truck could break down at any moment and is virtually worthless to anyone other than Mr. Marshall. It is old, unreliable, filthy and always cluttered with tools and other equipment related to Mr. Marshall's business. It is, in short, unsuitable for use by the Marshalls as family transportation; consequently, AmSouth's basic assumption is wrong, thus the argument based on that assumption is equally wrong. AmSouth's written objection is even less persuasive. In its Objection to Confirmation the bank contended that the only vehicle Mr. Marshall should be allowed to retain is the pickup truck. The bank argued, *"None of the collateral is necessary for the plan in that the Debtor has a separate vehicle which he uses for work."* Proceeding No. 32 (emphasis added).

**3.** While the section 1325(b)(2) phrase "reasonably necessary" has frugal connotations, this Court refuses to believe it requires Chapter 13 debtors to lead a Spartan and uncertain existence while performing under their plans. Reliable transportation is essential to the successful completion of any Chapter 13 plan.

## B. AmSouth's Secured Objection

The basis of AmSouth's objection as a secured creditor is 11 U.S.C. § 1325(a)(5). That section allows confirmation only if:

(5) with respect to each allowed secured claim provided for by the plan—

(A) the holder of such claim has accepted the plan;

(B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and

(ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; or

(C) the debtor surrenders the property securing such claim to such holder. . . .

11 U.S.C. § 1325(a)(5).

Both the Grand Am and the Bonneville are collateral for AmSouth's secured claim. Mr. Marshall proposed to pay AmSouth $9,487.00 plus interest at the rate of 9%.[4] The mathematical difference between the parties' agreed to value of the Grand Am as $6,850.00 and Mr. Marshall's proposal to pay AmSouth $9,487.00, would assign a value to the Bonneville of $2,637.00. According to the appraisals submitted by both parties however, the Bonneville is worth much more than that. Consequently, Mr. Marshall's plan would not comply with Section 1325(a)(5) and cannot be confirmed for that reason. Unless the plan is modified the secured portion of AmSouth's objection to confirmation is due to be sustained.

## C. Valuation of the Bonneville

This Court can, of course, determine the value of the Bonneville for purposes of Section 506(a), and the Debtor can make his plan confirmable by proposing to pay the value established by the Court, in addition to the value of the Grand Am, to AmSouth. Each party submitted an affidavit of a qualified expert on the subject of the value of used cars. Each expert proffered his opinion regarding the fair market value of the Bonneville. There is quite a disparity between the two. Mr. Marshall's expert opined that the car is worth $6,000.00. AmSouth's expert believes that the value of the car is $8,400.00. Both experts appear to be well qualified and this Court can discern no basis from the affidavits to disparage either of their opinions or to favor one's opinion over that of the other.

Each expert is a "licensed wholesaler, retailer, rebuilder and reconditioner of automobiles." The problem with both affidavits is that neither indicates whether his opinion is based on the wholesale value of the automobile or the retail value of the automobile.[5] The difference may be substantial. Some courts have held that a Chapter 13 debtor must propose to pay the retail value of an automobile in order to satisfy 1325(a)(5).[6] Other courts maintain that the debtor must pay the average between the wholesale and the retail value of the automobile.[7] And then many courts have determined that 1325(a)(5)

---

4. No issue has been made or objection raised by AmSouth regarding the rate of interest which the Debtor proposes to pay on its secured claim.

5. Both appraisers noted specific faults in the Bonneville and assigned a value to the car based upon its present "as is" condition. What is not specified in either affidavit is whether the values were assigned with an eye toward: (a) a retailer repairing the car and offering it for sale to the public or (b) a wholesaler repairing the car and bidding it out at wholesale or (c) a retailer selling the car "as is" at retail or (d) a wholesaler bidding the car out at wholesale "as is" or (e) the Debtor repairing the car and selling it privately or (f) the Debtor selling the car "as is." Assuming that the means of disposition of the automobile would in some measure dictate the amount that could be obtained for the vehicle, the Court lacks, from the outset, necessary information to evaluate the appraisals.

6. *In re Rash*, 31 F.3d 325, 329 (5th Cir.1994); *In re Arnette*, 156 B.R. 366, 368 (Bankr.D.Conn. 1993); *In re Green*, 151 B.R. 501, 506 (Bankr. D.Minn.1993); *In re Reynolds*, 17 B.R. 489, 493 (Bankr.N.D.Ga.1981).

7. *In re Rowland*, 166 B.R. 172, 176 (Bankr. N.D.Fla.1994); *In re Carlan*, 157 B.R. 324, 326 (Bankr.S.D.Tex.1993); *In re Stauffer*, 141 B.R. 612, 614 (Bankr.N.D.Ohio 1992); *In re Chapman*, 135 B.R. 11, 14 (Bankr.M.D.Pa.1990); *In re Thayer*, 98 B.R. 748, 750 (Bankr.W.D.Va. 1989); *In re Johnson*, 8 B.R. 503, 505 fn. 1 (Bankr.S.D.Tex.1981); *In re McLeod*, 5 B.R. 520, 521 (Bankr.N.D.Ga.1980); *In re Miller*, 4 B.R. 392, 394 (Bankr.S.D.Cal.1980).

only requires a Chapter 13 debtor to pay the wholesale value of an automobile, at least in situations where the lienholder is not an automobile retailer.[8]

■ According to the January, 1995, issue of the National Automobile Dealers Association Official Used Car Guide, (N.A.D.A.), a 1989 Pontiac Bonneville has an average trade in value of $7,800.00 and an average retail value of $9,825.[9] The average amount between the N.A.D.A. trade in value, which is generally considered synonymous with wholesale value, and the N.A.D.A. retail value of the Bonneville, is $8,812.50. These figures however, are not conclusive, and other evidence of value may require either an upward or downward adjustment of the N.A.D.A. values, or dictate that a figure other than the N.A.D.A. values should be used.[10]

■ The value assigned to the Bonneville by the Debtor's appraiser is $1,800.00 lower than the N.A.D.A. wholesale value. Absent corroborating testimony from the Debtor indicating that the car is in very poor condition, or other evidence tending to clarify or corroborate the basis of that appraisal, the Court cannot accept $6,000.00 as the value of the Bonneville.

■ On the other hand, the value assigned to the Bonneville by AmSouth's appraiser is $1,425.00 lower than the N.A.D.A. retail value and $412.50 lower than the average between the N.A.D.A. retail and trade in values and is only $600.00 more than the N.A.D.A. trade in value. Under the circumstances, $8,400.00 seems reasonably accurate when considered in light of the N.A.D.A. values. The Court therefore finds that the value of the Bonneville is $8,400.00.[11]

## IV. Conclusion

Based on the record in this case and the arguments of counsel the court determines

8. *In re Mitchell,* 954 F.2d 557, 560 (9th Cir. 1992); *In re Malody,* 102 B.R. 745, 749 (9th Cir. BAP 1989); *In re King,* 165 B.R. 296, 300 (Bankr.M.D.Fla.1994); *In re Angel,* 147 B.R. 48, 49 (Bankr.D.Idaho 1992); *In re Rossow,* 147 B.R. 1, 2 (Bankr.W.D.N.Y.1992); *In re Phillips,* 142 B.R. 15, 17 (Bankr.D.N.H.1992); *In re Owens,* 120 B.R. 487, 490 (Bankr.E.D.Ark.1990); *In re Johnson,* 115 B.R. 515, 516 (Bankr.D.S.C. 1988); *In re Cook,* 38 B.R. 870, 875 (Bankr. D.Utah 1984); *In re Klein,* 10 B.R. 657, 660 (Bankr.E.D.N.Y.1981); *In re Van Nort,* 9 B.R. 218, 221 (Bankr.E.D.Mich.1981); *In re Willis,* 6 B.R. 555, 559 (Bankr.N.D.Ill.1980); *In re Crockett,* 3 B.R. 365, 367 (Bankr.N.D.Ill.1980).

9. The N.A.D.A. publication is universally recognized as relevant and material evidence of the value of used automobiles. *In re Johnson,* 165 B.R. 524, 528 (S.D.Ga.1994); *In re Rowland,* 166 B.R. 172, 176 (Bankr.N.D.Fla.1994); *In re King,* 165 B.R. 296, 300 (Bankr.M.D.Fla.1994); *In re Phillips,* 161 B.R. 824, 825 (Bankr.W.D.Mo. 1993); *In re Carlan,* 157 B.R. 324, 326 (Bankr. S.D.Tex.1993); *In re Arnette,* 156 B.R. 366, 368 (Bankr.D.Conn.1993); *In re Collins,* 151 B.R. 967, 970 (Bankr.M.D.Fla.1993); *In re Green,* 151 B.R. 501, 506 (Bankr.D.Minn.1993); *In re Angel,* 147 B.R. 48, 49 (Bankr.D.Idaho 1992); *In re Rossow,* 147 B.R. 1, 2 (Bankr.W.D.N.Y.1992); *In re Stauffer,* 141 B.R. 612, 614 (Bankr.N.D.Ohio 1992); *In re Chapman,* 135 B.R. 11, 14 (Bankr. M.D.Pa.1990); *In re Owens,* 120 B.R. 487, 491 fn. 3 (Bankr.E.D.Ark.1990); *In re Johnson,* 117 B.R. 577, 581 (Bankr.D.Idaho 1990); *In re Johnson,* 115 B.R. 515, 516 (Bankr.D.S.C.1988); *In re*

*Thayer,* 98 B.R. 748, 750 (Bankr.W.D.Va.1989); *In re Smith,* 42 B.R. 198, 200 (Bankr.N.D.Ga. 1984); *In re Cook,* 38 B.R. 870, 872 (Bankr. D.Utah 1984); *In re Klein,* 20 B.R. 493, 495 (Bankr.N.D.Ill.1982); *In re Reynolds,* 17 B.R. 489, 490 (Bankr.N.D.Ga.1981); *In re Clements,* 11 B.R. 38, 39 (Bankr.N.D.Ga.1981); *In re Johnson,* 8 B.R. 503, 505 fn. 1 (Bankr.S.D.Tex.1981); *In re Cooper,* 7 B.R. 537, 540 (Bankr.N.D.Ga. 1980); *In re Willis,* 6 B.R. 555, 558 (Bankr. N.D.Ill.1980); *In re McLeod,* 5 B.R. 520, 521 (Bankr.N.D.Ga.1980).

10. *In re Johnson,* 165 B.R. 524, 530 (S.D.Ga. 1994); *In re Angel,* 147 B.R. 48, 49 (Bankr.D.Idaho 1992); *In re Owens,* 120 B.R. 487, 491–92 (Bankr.E.D.Ark.1990); *In re Johnson,* 117 B.R. 577, 581–82 (Bankr.D.Idaho 1990); *In re Smith,* 42 B.R. 198, 200 (Bankr.N.D.Ga.1984); *In re Willis,* 6 B.R. 555, 566 (Bankr.N.D.Ill.1980).

11. Neither party proposed a property valuation date. Some courts have determined that the proper date of valuation is the date the petition was filed. Other courts value property for purposes of 1325(a)(5) as of a later date, such as the date of the valuation hearing or the date of confirmation. AmSouth's appraisal was conducted on February 3, 1995, and the Debtor's appraisal was conducted on January 13, 1995. The closeness of these dates indicates that the parties, if asked, would propose a date somewhere in that time frame as the proper date of valuation. For purposes of the Court's valuation, the N.A.D.A. values contained in the April, 1995, issue are the same as those contained in the January, 1995, issue.

that the objection to confirmation of the Debtor's Chapter 13 plan is due to be overruled, in part, and conditionally sustained, in part, pending amendment of the plan by the Debtor to accommodate the findings contained herein regarding the value of AmSouth's collateral.

### V. Order

Based on the above, it is therefore **ORDERED** that:

1. The Objection to Confirmation of the Debtor's Chapter 13 plan filed by AmSouth Bank pursuant to *11 U.S.C. § 1325(b)(1)(B)* is **OVERRULED.**

2. The value of the Debtor's 1989 Pontiac Bonneville is $8,400.00.

3. AmSouth is allowed a secured claim in the amount of $15,250.00 and will retain a lien on the 1991 Pontiac Grand Am and the 1989 Pontiac Bonneville to secure payment of that amount, plus interest at the rate provided for in the plan.

4. The Objection to Confirmation of the Debtor's Chapter 13 plan filed by AmSouth Bank pursuant to *11 U.S.C. § 1325(a)(5)* is **SUSTAINED** unless the Debtor amends his plan within the next 15 days to provide payment to AmSouth Bank of $15,250.00 for its secured claim, plus interest at the rate provided for in the plan.

Done and ordered.